IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KENNETH HURST, )
)
        **Plaintiff,** )
)
  v. ) No. 11 C 8400
)
JEAN MAUGER, et al., )
)
        **Defendants.** )

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Plimus, Inc.'s (Plimus) motion for summary judgment. For the reasons stated below, the motion for summary judgment is granted.

## BACKGROUND

Plaintiff Kenneth Hurst (Hurst) alleges that Plimus markets and distributes Plimus' products and services through vendors who are authorized to market products on behalf of Plimus. Defendant Jean Mauger (Mauger) was allegedly one such vendor. Mauger allegedly acquires phone numbers from third-parties for the purpose of sending unauthorized spam text message advertisements "for and on behalf of Plimus." (TA Compl. Par. 18). On July 27, 2011, Hurst allegedly received

1

two text messages sent from Mauger (Text Messages), advertising "4000 Satellite Channels On The Internet For Free" and including a link to a website. (TA Compl. Par. 19-20). The website is allegedly hosted by Plimus, and it allows consumers to purchase a "Satellite TV for PC" product from Plimus.

Plimus allegedly receives revenue from the sale of products, and allegedly pays its vendors, including Mauger, based on the vendor's ability to generate customers for Plimus. Plimus allegedly has the right to terminate its relationship with any vendor if the vendor violates any law. In addition, pursuant to written agreement, vendors allegedly indemnify Plimus for any loss they cause to Plimus.

Hurst alleges that a search of Mauger's domain address shows hundreds of consumer complaints regarding text messages sent by Mauger. Hurst also alleges that Plimus "was undoubtably aware" that Mauger was sending text messages. (SA Compl. Par. 23). In addition, Hurst alleges that the volume of consumer complaints indicates that Mauger was using auto-dialers to send text messages. Hurst filed the instant action individually and on behalf of all others similarly situated, and includes in his Third Amended Class Action Complaint, which the court notes is actually a second amended complaint, claims brought against Mauger and Plimus alleging a violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 *et seq*. Plimus now moves for summary judgment on the claim brought against it. Mauger has not appeared in the case and there appears to be a question as to proper service on Mauger.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A "genuine issue" of material fact in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

Plimus contends that summary judgment should be granted in its favor because Plimus is not liable for the Text Messages under the TCPA or under any theory of vicarious liability.

I. Liability Under the TCPA

Plimus argues that the undisputed facts show that Plimus is not liable for the Text Messages under the TCPA. Hurst's TCPA claim against Plimus is brought pursuant to 47 U.S.C. § 227(c)(5) (Section 227(c)(5)), which provides that

> [a] person who has received more than one telephone call within any 12-month period *by or on behalf of the same entity* in violation of the regulations prescribed under this subsection may . . . bring . . . (A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or (C) both such actions.

47 U.S.C. § 227(c)(5)(emphasis added); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955-95 (9th Cir. 2009)(holding that the Federal Communications Commission (FCC) "ha[d] reasonably interpreted 'call' under the TCPA to encompass both voice calls and text calls," and therefore giving deference to the FCC's interpretation); *Strickler v. Bijora, Inc.*, 2012 WL 5386089, at *4-5 (N.D. Ill. 2012)(finding that "the language of the TCPA and its legislative history support the conclusion that the term 'call' encompass both oral calls and text messages"). It is undisputed that Mauger, not Plimus, sent the Text Messages to Hurst. (R SF Par. 4). Thus, Plimus is liable under the TCPA only if the Text Messages were sent "on behalf" of Plimus. 47 U.S.C. § 227(c)(5).

Hurst argues that there are genuine issues of material fact, making summary judgment inappropriate. However, in disputing the facts asserted by Plimus, Hurst has primarily set forth legal arguments, legal conclusions, Hurst's own

4

characterizations of the undisputed facts in the record, and statements unsupported by accurate citations to the record. Such statements do not comply with Local Rule 56.1 (Rule 56.1). *See Ammons v. Aramark Uniform Services, Inc*., 368 F.3d 809, 817 (7th Cir. 2004)(reiterating that "a district court is entitled to expect strict compliance with Rule 56.1"); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n2 (7th Cir. 2008)(stating that "[i]t is inappropriate to make legal arguments in a Rule 56.1 statement of facts"); *Senske v. Sybase, Inc*., 588 F.3d 501, 504 (7th Cir. 2009)(indicating that "repeatedly and improperly characteriz[ing] facts as disputed without citing evidence that directly contradicts [the other party's] assertions" does not "demonstrate a genuine fact dispute")(citation omitted); *Richmond v. Dart*, 2013 WL 1174436, at *4 (N.D. Ill. 2013)(indicating that "the Court will not consider any improper assertions or denials unsupported by record citations or those that contain improper argument"); *Hartford Fire Ins. Co. v. Taylor*, 2012 WL 5197681, at *7 (N.D. Ill. 2012)(stating that "a party's own characterization of evidence is not permitted in a Local Rule 56.1 statement"). Hurst cannot create a genuinely disputed issue of fact by advancing, in response to Plimus' Rule 56.1 statement of facts and in his Rule 56.1 statement of additional facts, legal arguments, legal conclusions, and factual statements unsupported by the cited portions of the record. The facts are undisputed with respect to the role Plimus played in the marketing and sale of the product at issue in this case. Thus, the court must determine based on the undisputed facts whether, as a matter of law, the Text Messages were sent "on behalf of" Plimus. 47 U.S.C. § 227(c)(5).

The parties have provided case law from other circuit courts and other district courts in support of their arguments on the issue of whether the Text Messages were sent on behalf of Plimus, so as to make Primus liable for the Text Messages under Section 227(c)(5). Although at least two lawsuits have been referred to the FCC for determinations with respect to whether the "on behalf of" language found in Section 227(c)(5) applies to the defendants in those cases, the FCC has yet to announce its position regarding the scope of liability that exists under the TCPA. *See Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010)(observing that "[i]n interpreting the [TCPA] and its regulations, courts have reached different conclusions about whether an entity on whose behalf a call is made can be liable under the Act, announcing different measures for determining whether an independent contractor or an agent acts on behalf of a company," and referring the matter to the FCC)(citations omitted); *see also United States v. DISH Network, L.L.C.*, 2011 WL 475067, at *3 (C.D. Ill. 2011)(staying proceedings on the TCPA claim pending administrative action by the FCC).

Neither party in this case has moved to stay the instant action pending referral to the FCC, nor have the parties in this case suggested that the court abstain from ruling on the instant motion until the FCC makes its determinations in the other cases. Further, the undisputed facts in this case are significantly distinguishable from the facts presented in other TCPA cases to date. Based upon the unique facts presented in this case, the court will decide, as a matter of first impression, whether the phrase "on behalf of" should be construed broadly enough to extend liability to

Plimus under Section 227(c)(5).

Hurst's position is that the court should apply the plain meaning of the phrase "on behalf of" when ruling on the instant motion. (Resp. at 7-8, 11-12). This argument is persuasive. Under a plain meaning analysis, courts have found that "on behalf of" liability under the TCPA arises for a defendant when a marketer is either "a representative of" the defendant, or has acted "for the benefit of" the defendant. *United States v. Dish Network, L.L.C.*, 667 F.Supp.2d 952, 963 (C.D. Ill. 2009); *see also Worsham v. Nationwide Ins. Co.*, 772 A.2d 868, 878-79 (Md. App. Ct. 2001)(indicating that a defendant is liable under § 227(c)(5) of the TCPA when the defendant "direct[s] or authorize[s] [an independent contractor] to conduct [ ] solicitations via a common script created or approved by [the defendant]"); *Hooters of Augusta, Inc. v. Nicholson*, 537 S.E.2d 468, 472 (Ga. App. Ct. 2000)(stating that "an advertiser may not avoid liability under the TCPA solely on the basis that the transmission was executed by an independent contractor"); *Thomas v. Taco Bell Corp.*, 879 F.Supp.2d 1079, 1084 (C.D. Cal. 2012)(indicating that TCPA liability can arise "vicariously, such as, if [a party] was in an agency relationship with the party that sent the text message," and stating that, to establish an agency relationship, a plaintiff "must demonstrate that . . . Taco Bell controlled or had the right to control [the marketer] and, more specifically, the manner and means of the text message campaign they conducted").

In the instant action, it is undisputed that Mauger and Plimus entered into a standard written agreement (Agreement) governing the relationship between the

7

parties. (R SAF Par. 37). Its is also undisputed that under the Agreement, Mauger was both a "Vendor" and a "Seller". (R SAF Par. 38). The Agreement defines "Products" sold through Plimus as "[g]oods and/or services *marketed and offered by the Seller* through Plimus . . . , including software programs, games, digital products, digital media, provision of online and/or offline services, web-hosting, Internet- or cellular-based programs, games, services and media, and sale of certain physical goods . . . ." (SAF Ex. A1 § 1)(emphasis added). Further, a Vendor is defined as a party "*who markets or offers for resale its own Products* to Consumers through the Plimus Services" (SAF Ex. A1 § 1)(emphasis added).

In addition, it is undisputed that Plimus provided "Plimus Services" to approximately 6,000 vendors worldwide at any given time between April 2011 and January 2012. (R SF Par. 12). "Plimus Services" are defined under the Agreement as "[o]nline commerce services and purchasing facilities rendered by Plimus to the Seller, through the Plimus System . . . ." (SAF Ex. A1 § 1). The Agreement provides that the Plimus System allows a "Seller to upload and/or create secure sales links to Products and to obtain transaction reports." (SAF Ex. A1 § 1). The Agreement also provides that the sale price is set by the Seller, and that "Plimus shall resell Products set up in the Plimus System by the Seller as and when Customers transact to purchase such items through active sales links." (SAF Ex. A1 § 10.1, 9.1). Under the Agreement, the Seller is required to represent Plimus at all times "only as the reseller" of the Seller's products, but Plimus is the merchant of record with respect to any sales made through the Plimus System. (SAF Ex. A1 § 2.1-2.2).

It is also undisputed that a Customer wishing to purchase a product offered for sale through the Plimus System clicks on a "buy now link" provided by Plimus to the Seller, and that the Customer is then directed to a checkout page hosted by Plimus. (R SF Par. 9). Once there, the Customer provides payment information to Plimus so that Plimus can process the payment with a credit card issuer or other financial intermediary. (R SF Par. 9). If the payment is approved, Plimus sends the Customer an email confirming payment and providing a link to download the digital product, which the Vendor provides to Plimus when creating an account. (R SF Par. 11). Plimus then collects the payment from the financial intermediary and passes it through to the Seller after taking a standard commission. (R SF Par. 9). Plimus' commission is a flat 75¢ on any Products sold for $4.99 or less, and ranges from 4.5% to 15% on any Products sold for $5.00 or more. (SAF Ex. A1, Ex. A).

Further, Plimus is responsible under the Agreement for charging Customers, processing sales transactions and Customers' payments, delivering an electronic invoice/receipt to Customers in the name of Plimus, and "effect[ing] delivery of digital titles and/or relevant license keys and/or product activation codes to Customers through the Internet and/or other networks." (SAF Ex. A1 § 9, 2). The Seller is responsible for providing all technical information to Customers. (SAF Ex. A1 § 2.3). Under the Agreement, Plimus provides no "warranty, maintenance, technical or product support services, except for download and fulfillment services when applicable." (SAF Ex. A1 §2.4). In addition, under the Agreement, the Seller "accepts sole liability and responsibility for the performance and design of the

Products," and "all inquiries and complaints pertaining to the Products" must be directed to the Seller. (SAF Ex. A1 § 5.12). Further, "[t]he Seller warrants that at all times it will hold itself out as the sole responsible party vis-á-vis Customers in relation to the Products and/or their functionality, and will in no manner represent that Plimus is a guarantor or responsible party for those Products, or otherwise involve Plimus in a Customer or other third party dispute relating to the sale, delivery, or functionality of a Product." (SAF Ex. A1 § 5.13).

With respect to Mauger specifically, it is undisputed that Mauger signed up for Plimus' payment processing services on April 3, 2011, to sell a product called "Internet TV Software" (Product). (R SF Par. 20). It is also undisputed that after approving the account, Plimus sent Mauger a link to a "buy now page" on which consumers could provide their payment information. (R SF Par. 21). In addition, it is undisputed that the Product sold for $19.99, and that Plimus took a standard commission of 10% on each sale, until Mauger's account was suspended by Plimus on January 12, 2012. (R SF Par. 22-23); (SAF Ex. A1, Ex. A).

Hurst argues that the Text Messages were sent "on behalf of" Plimus under the plain meaning of the phrase. In support of his argument, Hurst repeatedly denies Plimus' assertion in its Rule 56.1 statement of facts that Plimus provides payment processing services. As discussed above, Plimus Services are defined under the Agreement as "[o]nline commerce services and purchasing facilities." (SAF Ex. A1 § 1). In addition, under the Agreement, Plimus is responsible for, among other things, charging Customers, processing sales transactions and Customers' payments,

and delivering an electronic invoice/receipt to Customers. (SAF Ex. A1 § 9, 2). Thus, based upon the undisputed facts, Plimus' services are appropriately described as payment processing services.

Hurst also repeatedly argues that Plimus is the seller of the Product and that the Product offered by Mauger was Plimus' product. However, the undisputed facts discussed above demonstrate that the Product was not Plimus' product, and that Plimus merely acted as a reseller of Mauger's Product. For example, it is undisputed that Mauger was a Vendor under the terms of the Agreement, and that the Agreement defines a Vendor as a party "*who markets or offers for resale its own Products* to Consumers through the Plimus Services" (R SAF Par. 38); (SAF Ex. A1 § 1)(emphasis added). In addition, under the Agreement, Plimus did not set or have any control over the sales price of the Product. (SAF Ex. A1 § 10.1, 9.1). Further, under the Agreement, Mauger was required to represent Plimus at all times "only as the reseller" of the Mauger's products, and warrant that at all times Mauger was "the sole responsible party vis-á-vis Customers in relation to the Product[] and/or [its] functionality." (SAF Ex. A1 § 2.1). In addition, it is undisputed that Mauger was one of 6,000 vendors selling products through the Plimus System, and there is no evidence in the record indicating that Plimus purchased the product from Mauger prior to reselling it to consumers. (R SF Par. 12). The mere fact that Plimus was listed as the merchant of record, or that Plimus sent the Consumer a link to the Product does not make the Product Plimus' product. Based upon the undisputed facts, Plimus was not the seller of the Product and the Product was not Plimus'

product.

Hurst further argues that the Text were sent "on behalf of" Plimus based on the commission that Plimus received for each sale of the Product. However, the fact that Plimus makes a commission from the sale of Mauger's products does not conclusively establish that the Text Messages were sent "on behalf of" Plimus. It is undisputed that Plimus received a standard 10% commission on each sale of the Product. (R SF Par. 22-23); (SAF Ex. A1, Ex. A). It is also undisputed that, out of that 10%, Plimus was responsible for paying transaction fees to various financial intermediaries. (R SAF Par. 47). Therefore, it is undisputed that Mauger received 90% of the sales price from each Product sold, and that Plimus generally received less than 10% of the sales price from each Product sold. Thus, while Plimus undisputedly receives some benefit from the sale of the Product, that benefit does not rise to such a level that the Text Messages can be said to have been sent on behalf of, or for the benefit of Plimus.

Hurst also argues, based solely on an anti-spam provision in the Agreement, that Plimus had control over or was involved in the marketing of Mauger's product. Under the Agreement, "[t]he Seller warrants that it (or any third party authorized by it) will NOT use the Plimus Services in any illegal marketing campaigns, [ ] will not share Customer data with any third party for such purposes, . . . [and] will NOT use the Plimus Services , Plimus sales page links or Customer data for any spam email campaigns . . . ." (SAF Ex. A1 § 5.10-5.11). Contrary to Hurst's position, the inclusion of such provisions in the Agreement does not show that Plimus requested,

instructed, supervised, or approved Mauger's sending of the Text Messages. In fact, the anti-spam provisions in the Agreement cut against the suggestion that Plimus played any role in the sending of the Text Messages. Further, although Plimus arguably should have been more diligent in monitoring Mauger's compliance with the anti-spam provisions found in the Agreement, such a fact provides minimal insight into whether the Text Messages were sent on behalf of Plimus, which is the only relevant inquiry with respect to liability under Section 227(c)(5). It is undisputed that the Agreement provides that the Seller has "[a]ll responsibility for marketing and driving Customers to [the] sales links" provided by Plimus to the Seller. (SAF Ex. A1 § 9.2). In addition, although the undisputed facts show that Plimus does offers some marketing services to Sellers, (SAF Ex. A1 § 1), there is no evidence in the record indicating that Mauger ever used Plimus' marketing services, or that the marketing services that are offered by Plimus violate the TCPA in any way. Thus, the undisputed facts in this case show that Plimus had no involvement whatsoever in the marketing of the Product, including in the sending of the Text Messages.

As discussed above, the Product marketed and sold was Mauger's product. Plimus merely acted as an intermediary between Mauger and the purchasers of Mauger's product. Plimus' role was limited to facilitating the processing of payments and delivering the Product. Based upon the undisputed fact that Plimus was not involved in the sending of the Text Messages, the undisputed fact that Mauger was one of 6,000 vendors selling products through the Plimus System, the

undisputed fact that Plimus did not set and had no control over the sales price of the Product, the undisputed fact that Plimus received a maximum of 10% of the sales price each time the Product was sold, and based on all of the other provisions in the Agreement, the court finds that the Text Messages were not sent "on behalf of" Plimus. Therefore, Plimus is not liable for the Text Messages under Section 227(c)(5).

II. Vicarious Liability

Hurst also asserts that Plimus is vicariously liable because there was a partnership between Mauger and Plimus to sell the Product. However, it is undisputed that Agreement provides that "Plimus, as a reseller of Products and service provider to Seller, is an independent contractor and is not an agent or employee of Seller," and that "[n]othing in [the] Agreement shall be deemed to constitute a partnership or agency relationship between the parties." (SAF Ex. A1 § 29). Further, even if there was a so-called partnership between Mauger and Plimus, as Hurst claims, Hurst has not pointed to any case law indicating that, based on the facts in this case, such a partnership is sufficient to establish vicarious liability. Instead, under existing case law, vicarious liability is only imposed on defendants when a third party has sent solicitations on its behalf. *See, e.g., Dish Network, L.L.C.*, 667 F.Supp.2d at 963; *Worsham v. Nationwide Ins. Co.*, 772 A.2d at 878-79; *Hooters of Augusta, Inc.*, 537 S.E.2d at 472; *Thomas*, 879 F.Supp.2d at 1084. The facts of this case are distinguishable from the facts of the cases in which courts have

found that a defendant might be vicariously liability for violations of the TCPA. As discussed above, in this case, the Product being sold is not Plimus' product, there is no evidence that Plimus played any role in the marketing of the Product, and Plimus did not receive the majority of the revenue from the sale of the Product. Therefore, Plimus is not liable for the Text Messages under any theory of vicarious liability. Based on the above, Plimus' motion for summary judgment is granted.

## CONCLUSION

Based on the foregoing analysis, Plimus' motion for summary judgment is granted. With respect to Mauger, the court notes that the record before the court raises some doubt as to whether Mauger was ever served with the summons and complaint in this case. Therefore, the claim against Mauger is dismissed without prejudice, and the motion for class certification is stricken as moot. If Hurst believes that he can obtain proper service on Mauger, the court will entertain a motion to reinstate the instant action as to Mauger. Alternatively, if Hurst believes that he can show that the individual who was previously served is the correct party to the instant action, the court will entertain evidence on the issue.

_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated: April 16, 2013